UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

| | |
|---|---|
| C.C., in her individual capacity and as parent and guardian of minor student, D.C.G., | Case No.: |
| Plaintiff, | |
| vs. | COMPLAINT AND JURY DEMAND |
| SEATTLE SCHOOL DISTRICT NO. 1, | |
| Defendant. | |

Plaintiffs, by and through their attorneys, allege as follows:

## I.    PRELIMINARY STATEMENT

1.1    This is a disability discrimination case brought by a student with a disability, D.C.G. (through her parent), against the Seattle School District No. 1 ("Defendant" or "District"). At Stevens Elementary, the conditions for special education students, including D.C.G., were particularly bad.

1.2    D.C.G. is a student that was repeatedly subjected to physical abuse along with excessive isolation and restraint at the hands of the District while she attended Stevens Elementary School ("Stevens"). Most notably, she was dragged by her arm across a room on one occasion and physically restrained with a staff member's knee to her back while she screamed "I can't breathe" on a separate occasion. Forensic Psychiatrist Jennifer L. Piel, M.D., J.D., has opined that "with reasonable medical certainty that [D.C.G.] sustained posttraumatic stress

COMPLAINT AND JURY DEMAND 1

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

disorder [PTSD] as a result of the events at Stevens during the 2019-2020 school year."

1.3     What happened to D.C.G. was not only completely foreseeable by those at the highest levels of District administration— it was inevitable. The District's central office staff openly referred to the situation at Stevens as a "burning dumpster fire." The special education program at Stevens was understaffed, the staff who were there were untrained, and the principal and his subsequent replacement were completely ineffective to the point of calling the police to deal with primary aged children. D.C.G. and her classmates were treated as criminals yet were wholly underserved and unsupervised. The District – at the highest levels of administration up– chose to pour gasoline on the fire instead of providing any sort of help to Stevens to ensure students like D.C.G. remained safe.

1.4     Plaintiffs bring this action against Defendant for violations of D.C.G.'s rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the Americans with Disabilities Act 42 U.S.C. 12101 et seq., Section 504 of the Rehabilitation Act of 1973, and her right to equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983. The Plaintiffs also bring claims under Washington state law to include violations of the Washington Law Against Discrimination, Negligence, Negligent Hiring, Training, and Supervision, False Imprisonment, Assault and Battery, Outrage, and Loss of Consortium.

## II.     JURISDICTION AND VENUE

2.1     This Court has jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. § 1331, including any civil action to redress the deprivation of any right, privilege, or immunity secured by the Constitution, laws, or treaties caused under the color of state law, statute, ordinance, regulation, custom, or usage pursuant to 28 U.S.C. § 1343.

2.2     This case arises under federal laws and this Court therefore has jurisdiction.

2.3     The Court has supplemental jurisdiction over state law claims made here pursuant to 28 U.S.C. § 1367.

COMPLAINT AND JURY DEMAND 2

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

2.4     A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred pursuant to 28 U.S.C. § 1391.

2.5     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all of the incidents complained of in this Complaint occurred in the city of Seattle, in King County, Washington.

### III.     PARTIES

3.1     Plaintiff D.C.G. is currently nine years old and lives in Seattle, in King County, Washington.

3.2     D.C.G. is African American and has been diagnosed with attention deficit/hyperactivity disorder (ADHD) and post traumatic stress disorder (PTSD).

3.3     D.C.G. qualifies as an "individual with a disability" within the meaning of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act (42 U.S.C. § 12131(2)), in that she has an impairment that substantially limits her ability to perform one or more major life activities and who, with or without a reasonable modification of educational program requirements, meets the essential eligibility requirement for the receipt of special education and other services provided by the District.

3.4     Plaintiff C.C. is African American, is the mother of D.C.G., and lives in Seattle, in King County, Washington.

3.5     Defendant Seattle School District is a first-class school district and quasi-municipal entity organized under the laws of Washington located in Seattle, in King County, Washington.

3.6     Pursuant to the Revised Code of Washington Section 28A.320.010, the District is a corporate body that possesses all the usual powers of a public corporation and may sue and be sued and transact all business necessary for maintaining and protecting the rights of the District. The District receives "Federal financial assistance" within the meaning of Section 504 of the Rehabilitation Act of 1973 and its implementing regulations. The District is a "public entity" within the meaning of Title II of the Americans with Disabilities Act because it is a "department,

COMPLAINT AND JURY DEMAND 3

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

1    agency, . . . or other instrumentality of a State . . .government." 42 U.S.C. § 12131(1).

2    Consequently, it is subject to suit under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §

3    2000d *et seq*.

4        3.7    The District is entrusted with the responsibility for ensuring that the rights and

5    protections under the federal and state Constitutions and laws are afforded to students who are

6    entitled to provision of its programs, services and procedures. Further, the School District is

7    responsible for enforcing, and ensuring that its subordinates, agents, and employees enforce the

8    federal and state laws pertaining to the provision of special education and related services to

9    qualified students.

10                    **IV.    FACTUAL ALLEGATIONS**

11        4.1    In agreeing to accept federal funding annually (including without limitation during

12    the years 2017 to present) for use in providing education, including special education programs

13    and services and mental health services, the District is responsible for providing each and every

14    special education qualified student, including D.C.G., with meaningful access to education and

15    reasonable accommodation, and to ensure that no student is subjected to discrimination because

16    of disability.

17                            **D.C.G.**

18        4.2    D.C.G. recently turned nine years old. She is currently in the third grade at

19    Hawthorne Elementary School within the District and D.C.G. has qualified for special education

20    services since her kindergarten year.

21        4.3    Through a recent special education eligibility reevaluation conducted by the

22    District, which included an assessment by Dr. Ronnie Cunningham Ph.D., D.C.G. was diagnosed

23    with Attention Deficient Hyperactivity Disorder – Combined Type (ADHD).

24        4.4    Additionally, Dr. Cunningham noted "that [D.C.G.] reported experiencing

25    genuine symptoms associated with panic and C.C. noted she is risk aversive when she believes

26    she may experience harm. These symptoms, plus other behavioral outbursts may be lingering

27    signs of PTSD that she has experienced since her traumatic incidents at Stevens Elementary

COMPLAINT AND JURY DEMAND 4

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

school."

4.5    As early as the 2017-2018 school year, (D.C.G.'s kindergarten year) she qualified for special education services with a diagnosis of Oppositional Defiance Disorder (ODD) demonstrated the need for additional behavior support in the classroom while she was attending Madrona Elementary School.

4.6    D.C.G. had an individual education plan in place at this time.

4.7    During the school year, D.C.G. was showing significant behavioral dysregulation and was engaging in activities such as destruction of school supplies and having emotional breakdowns in class. The school staff responded with use of restraint and isolation, which seemed to make the behavior issues worse in class.

4.8    D.C.G.'s mother questioned the school on the amount of time D.C.G. was spending in timeouts.

4.9    Within this school year, D.C.G.'s classroom was cleared at least 15 times due to D.C.G.'s destructive behaviors. Additionally, D.C.G. started to develop issues with incontinence over the school year.

4.10    Her future teachers would note that the incontinence was specifically linked to when she was restrained or isolated at school.

4.11    Niki Fisher, a District Behavior Specialist from the District's "Behavior Team" was called in to consult on D.C.G.'s case, but D.C.G. had already grown to be distrustful of staff she did not know, and she got physical with Ms. Fisher even during her observation of D.C.G.

4.12    The Behavior Team was able to offer no meaningful advice to the school and D.C.G.'s clear need for additional behavior support went unaddressed. School staff sought help from District special education administrators, but their calls for help went mostly ignored.

4.13    Internally, the school staff complained that they had to "force or trick" District administrators to come to important meetings where these issues are being discussed.

4.14    Over the course of several months, the Madrona staff grew intolerant of D.C.G. and simply stopped caring for her. The Principal, Mary McDaniel, went as far as to report D.C.G.

COMPLAINT AND JURY DEMAND 5

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

1   to Child Protective Services (CPS) for behavioral dysregulation.

2      4.15    On an occasion when D.C.G. had wet herself, the school staff allowed her to

3   complete the school day with no pants and then sent her on the bus to her after school program

4   with no pants on at all.

5      4.16    The school principal pushed the District for several months to move D.C.G. to a

6   different placement, which the District did the following school year.

7      4.17    In December 2018, D.C.G. was placed in the Social Emotional Learning (SEL)

8   classroom at Stevens. Immediately after she began, the staff started restraining her.

9      4.18    While D.C.G.'s individualized education program (IEP) only called for her to

10  receive 15 minutes a day in the special education setting, D.C.G. was spending her entire day,

11  every day, in the SEL classroom (a highly restrictive, self-contained class).

12     4.19    D.C.G. has an average IQ and can keep up with her general education peers, if

13  given the opportunity.

14     4.20    Numerous special education teachers expressed to the District that D.C.G. should

15  not be in the SEL classroom at all. Some identified that it was a "travesty" to keep her in a self-

16  contained classroom.

17     4.21    It was clear to the special education staff that D.C.G. was more triggered by her

18  time in the SEL classroom. However, D.C.G.'s general education teacher at the time, Michelle

19  Martine, made it clear to school administrators that she did not and does not support the

20  integration of the SEL students in her classroom and repeatedly pushed D.C.G. out of the general

21  education setting.

22     4.22    During the 2019-2020 school year, things only became worse for D.C.G. The

23  District's tracking system for restraint and isolation had a recorded 17 incidents of restraint and

24  isolation of D.C.G.[1] Most of these recorded incidents of restraint were not reported to the parent.

25     4.23    D.C.G.'s mental health noticeably declined during this time as things got worse

26

27  _____

[1] The staff were not reporting most incidents of restraint and isolation, so the number of times D.C.G. was restrained is much higher.

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

and she was continuing to wet herself when restrained or isolated.

4.24    D.C.G. reported to C.C. that she was terrified of one instructional assistant (IA) in particular, Michael Wilcox. Wilcox was the IA that was assigned to her most often. D.C.G. said Wilcox would cause her wrists to bleed on several occasions through the force of his restraints.

4.25    C.C. reported all of this to the District, but there was no follow up on this report although Wilcox had several other complaints against him.

4.26    Things only declined over the course of the year. D.C.G.'s behavioral dysregulation became a daily occurrence, and she was often engaging in destructive behaviors around the school. D.C.G. continued to be pushed out of general education and her general education teacher threatened to quit if something was not done.

4.27    Principal Brian Fitch resorted to increasingly punitive and inappropriate interventions such as suspending D.C.G.

4.28    School staff began to note in reports that D.C.G. was showing signs of trauma when she was restrained by staff.

4.29    The situation culminated into two distinct instances of physical abuse. On January 14, 2020, the school counselor, Jen Greenstein, walked into the SEL classroom and witnessed an IA, Kierra Hugely, drag D.C.G. while on the ground by the arm into a closet.

4.30    Greenstein immediately reported this incident to the District and complied with her obligations as a mandated reporter, but nothing was done to prevent the harm from happening again. The school staff went back almost immediately to use of restraint and isolation on D.C.G.

4.31    No staff were disciplined because of the physical abuse, except for Greenstein who reported the abuse.[2] The staff continued to report very few of these incidents in the District system, and even when reports were properly filled out, C.C. was not informed of what was happening to her child.

4.32    In early February 2020, the school staff resorted to more drastic measures for

---

[2] Greenstein was sent a threatening email by Principal Finch accusing her of lying in her report and asking her to come to a meeting with her union representative. Greenstein requested not to return to Stevens after the retaliation.

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

dealing with the seven-year-old child. By then, Principal Finch was no longer at the school. His replacement, Principal John Hughes, had resorted to calling the police to deal with primary students, including D.C.G. *See below.*

---

**SEATTLE POLICE DEPARTMENT**
**COMPLAINT HARDCOPY**

CP 2020 - 44642                                    Reported: Feb-05-2020 10:23:07

Summary Information
    Call Number:   **2020-44642**   Date/In Time: **Feb-05-2020 10:23:07**   Status: **CLOSED**
    Initial Call Type: **ASLT - WITH OR W/O WEAPONS (NO SHOOTINGS)**
    Final Call Type: **--DISTURBANCE - OTHER**
    Priority: **3**   Queue Type: **R**   How Received: **911**
    Address: **1242 18 AV E**   Community: **SEATTLE**
    Place Name: **in STEVENS ES**
    District: **C**   Zone: **C2**   Grid: **7701**
    Telephone: **252-3377**
    Call Taker: **7370 TURNER, JULIANN**   Call Taker Desk: **CT27**

    Initial Remarks :
        **IN FRONT HALLWAY NEAR ENTRANCE TO SCHOOL, 3 MALE**
        **AND 1 FEMALE STUDENT, 1ST AND 2ND GRADERS, REF TO**
        **GO TO CLASS, RUNNING AROUND, AND KICKING**
        **PRINCIPAL, MEDICS DELCINED, REQ OFFICER**

---

4.33    C.C. only learned through records requests by her attorneys that Hughes had made this call to the police.

4.34    On March 4, 2020, D.C.G. was grabbed and restrained against a wall by Hughes, with his knee to her back. There is no discernable reason for Hughes' actions, as D.C.G. was quietly sitting at a computer before she was grabbled. It was only when Angel Graves, Stevens' Student and Family Advocate, heard D.C.G.'s screams and walked in that Hughes released D.C.G. from the wall, which caused her to fall to the floor. Hughes then reengaged in the restraint of D.C.G. on the floor. Hughes then ordered the Stevens front desk staff to call the District security office, and a tactical officer, Dave Raybern, was sent out to Stevens.

4.35    When Raybern arrived, he too restrained D.C.G. Ms. Graves said Raybern used his knee to pin D.C.G. first to the wall, then to the floor. Hughes said Raybern used first his thigh, then his shin on her back.

4.36    Erin Romanuk, who oversees discipline for the District, later shared that District staff are trained that legs should never be placed on students "due to the risk of death."

COMPLAINT AND JURY DEMAND 8

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

4.37    It was only after D.C.G. began to scream "I can't breathe! I can't breathe!" that Ms. Graves was able intervene and rescued D.C.G. from the dangerous hold. She was sent home with her grandmother, with no explanation being provided to her family as to what she had been through.

4.38    The District then issued a one-day suspension to D.C.G. This suspension continues to stand in D.C.G.'s educational record.

4.39    Even though Ms. Graves immediately reported what she had observed to the District's central office staff, Raybern continued employment with the District until local news media learned of this incident.

4.40    Hughes finished out the 2019-2020 school year at Stevens with no apparent consequence for his actions.

4.41    D.C.G. remains severely traumatized by all this. She continues to be hesitant even with her trusted therapist to discuss the abuse she suffered at Stevens.

4.42    D.C.G. has been diagnosed with PTSD as a result of the incidents at Stevens during the 2019-2020 school year.

4.43    D.C.G. is in need of additional mental health treatment for her mental health symptoms.

## C.C.

4.44    During this entire course of events, C.C. remained an active and involved parent that wanted to be cooperative with any issues that arose at school. When the District would give C.C. information (or more often would just call her to pick up D.C.G. early from school) what the school was reporting was completely contrary to what C.C. was seeing at home.

4.45    At home, D.C.G. was a shy yet curious child who was not experiencing these extreme behavioral dysregulations.

4.46    C.C. repeatedly asked for reports or information about what was going on, to no avail.

4.47    The only times C.C. received actual information regarding what was going on was

COMPLAINT AND JURY DEMAND 9

when the staff broke with District administration and told her through text message or in person about what was happening.

4.48    The school staff were retaliated against by the Principals for informing C.C. of anything that happened at school.

4.49    By December 2019, C.C. knew there had to be more going on than what the school was reporting. She attempted to go to the school herself and meet with the Mr. Finch, who would either hide from her or ignore her requests for a meeting.

4.50    C.C. carries tremendous amounts of guilt from these events. When she was kept in the dark, she thought she was helping the school by denying D.C.G. hugs when she arrived home upset about what had transpired during her school day.

4.51    C.C. enrolled D.C.G. in mental health counseling to try to address the issues the school was seeing. However, C.C. did not know that the root of D.C.G.'s mental health decline was the abuse she was being subjected to at school. As such, C.C. continued to urge D.C.G. to go, not knowing she was directly placing her in harm's way.

4.52    After C.C. was eventually informed of the abuse D.C.G. suffered at Stevens, she was heartbroken. She could not understand why Hughes turned to security instead of Ms. Graves if he had a concern with D.C.G.'s conduct that day. C.C. also questioned why Hughes did not intervene when Raybern improperly restrained her daughter, until she learned that he had been restraining D.C.G. as well and considered calling the police on first and second graders to be an appropriate school management strategy. C.C. has had to take several days off work from her job to care for D.C.G. and herself because of the school abuse.

4.53    C.C. has suffered her own trauma in relation to D.C.G.'s abuse. C.C. began crying at work on random occasions not able to compartmentalize her own emotions about what happened.

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

### Issues with Special Education Services at Stevens Elementary

4.54    The issues with the SEL classroom D.C.G. experienced had been established long before she arrived. The special education staff at Stevens described the SEL classroom as "a pattern of systematic abuse steeped in racism." The classroom was composed of several long term IAs that were predominantly Black. These IAs were supervised by four special education teachers. All of the four special education teachers were white, female, first- or second-year teachers. This established a dynamic with significant racial hostility from the start.

4.55    The District administration was fully aware that the IAs at Stevens needed more training. Not even all of the IAs were trained in the District's Crisis Prevention Institute (CPI) use of restraint and isolation. Although, each IA engaged in physical restraint of children on a daily basis.

4.56    Staff reported that on average, they witnessed eight separate occasions of restraint of children in the SEL classroom per day. The IAs were known to be "quick to be hands on" meaning they would grab children quickly often without any provocation.

4.57    When special education teachers arrived at Stevens, Ms. Fisher would warn them of this and advise them to take copious notes to protect themselves.

4.58    On one occasion, when C.C. was called to pick up D.C.G. from school, Wilcox had D.C.G. locked in a storage room and had to use a key to be able to get her out.

4.59    In addition to the improper and excessive use of restraint, the special education staff would frequently isolate children in procedures violative of Washington law.[3] The SEL classrooms each had empty closets that were painted a jarring blood red color. The closets were referred to as "break rooms." The District kept large blue mats near the closets and would use the mats to cover the doorways to the closets to keep children confined inside.

4.60    Wilcox was observed by staff on one occasion using the blue mats to suffocate a

---

[3] RCW 28A.600.485.

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

child directly against the wall.[4]

4.61    The leader of the District's Behavior Team and former Special Education Supervisor, Dr. Stephanie King, came to Stevens in the 2019-2020 school year and was informed of the purpose of the blue mats. Dr. King told the special education staff "no more blue mats." However, as soon as she left the meeting, Principal Fitch, told the staff to keep using the mats. Dr. King never followed up with Stevens to ensure the practice of using the blue mats had ceased.

4.62    The special education staff at Stevens experienced especially high rates of turn over. In November 2019, D.C.G.'s SEL teacher, Rose Valente, was transferred to another school after she reported an IA for physically abusing another student in the SEL classroom.

4.63    Principal Fitch openly encouraged and permitted the staff retaliation against Valente. School staff went so far as to call Ms. Valente a racist openly in an all-staff meeting for reporting the abuse. The Stevens Seattle Education Association building representative Martine — the very same general education teacher who did not want D.C.G. or other students from the SEL program in her class – encouraged others to report their colleagues to the "Social Equity Educators" (a rank-and-file caucus of the SEA that focuses on democratic, anti-racist, and anti-oppression policies) if staff continued to report abuse of students at Stevens.

4.64    After Ms. Valente was transferred to a different school in November 2019, there was no special education teacher at all in D.C.G.'s SEL classroom until March 2020.

4.65    The understaffing issue was compounded by several IAs and special education teachers being put on administrative leave after reports of abuse would surface, with no replacements.

4.66    On one occasion in January 2020, Principal Fitch informed the District that 10 of 11 special education staff were out that day.

4.67    To make issues worse, Principal Fitch was relying on the special education staff

---

[4] The only investigation of this incident that occurred after it was reported by a staff witness was that the student was asked if it happened and they said "no." Interrogating students about Wilcox's behavior was a common practice within the District, but it was likely ineffective because the students were terrified of Wilcox and knew that there would be no consequences from the District to address his behavior.

COMPLAINT AND JURY DEMAND 12

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

to perform other duties around the school such as recess duty and was frequently pulling vital staff out of special education, leaving the children with no one to supervise them.

4.68    The District internal emails show that every level of the District special education administration was aware that every student in the SEL classroom had IEPs that were out of compliance and none of the IEPs were being followed, including D.C.G.'s.

4.69    The District committed to send District administration to help staff bring the IEPs into compliance and to write new behavior plans for students that needed them, but that project was dropped before it was finished. D.C.G.'s IEP and behavior plan were not actually compliant until after she was physically abused in March 2020.

### Issues with Administration at Stevens Elementary

4.70    Principal Fitch was an especially inept administrator and the District had been aware of his ineptitude for several years. Principal Fitch had a previous harassment, intimidation, and bullying (HIB) complaint against him for retaliating against a school nurse for advocating for a child with diabetes to receive necessary health services. The HIB complaint was founded, but the District only imposed a two-day suspension against Principal Fitch and allowed him to remain at Stevens.

4.71    Principal Fitch continued this practice of retaliating against staff members for advocating for special education students, especially those who reported abuse of D.C.G. or tried to inform C.C. of what was happening to D.C.G. at school.

4.72    Principal Fitch was the type of administrator that can make a bad situation worse. For example, in every email to an SEL parent, including C.C., he refers to students by "your second grader" instead of the students' actual name.

4.73    Principal Fitch was a substantial factor in making the situation that led to D.C.G.'s inevitable abuse even worse. In December 2019, he started canceling D.C.G.'s bus to try to prevent her from coming to school.

4.74    When C.C. came to the school asking for a meeting, he would hide from her or ignore her requests.

COMPLAINT AND JURY DEMAND 13

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

4.75    After the District's Human Resources staff ordered Principal Fitch to inform C.C. of the District's investigation results into the abuse of D.C.G., Principal Fitch did not comply. Principal Fitch would even go so far as to lie to his superiors saying that he had called C.C. when he had not.

4.76    When Principal Fitch did speak with C.C. about the January 2020 incident when D.C.G was abused, he basically accused Greenstein of lying in her report and maintained that the staff did nothing wrong.

4.77    As incompetent as Principal Fitch was, he did reach out to higher levels of District administration often begging for help. He sent multiple emails seeking guidance as to how the staff could better restrain D.C.G. on the ground.

4.78    This should have raised alarm bells for the District considering restraint on the ground is a prohibited practice in the District. Principal Fitch also reached out to District administration and District Human Resources staff with numerous calls and emails regarding the issues around the lack of staffing. He stated to the District that the situation with D.C.G. had become out of control and dangerous. He warned the District that kindergarteners were wetting themselves because D.C.G. was so frequently running amok around the school that the younger children were scared to leave their classrooms to use the restroom.

4.79    The District did not respond to any of these fraught cries for help.

4.80    Principal Fitch asked for a demotion and transfer to a different school in February 2020. The District signed a settlement agreement with Fitch allowing him to take paid leave for the remainder of the year and then transferred him to a teacher position at a different school.

4.81    Fitch remains employed by the District, to date.

4.82    Although the District was well aware of Fitch's transfer, the District presented affirmative misinformation to Stevens staff about what happened to Fitch.

4.83    After Greenstein made an HIB report against Fitch for retaliating against her when she reported D.C.G. being dragged by the arm, the District informed her they would not complete their investigation because Fitch was no longer with the District.

COMPLAINT AND JURY DEMAND 14

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

4.84    The District Superintendent, Denise Juneau, went so far as to send out an email to the staff at Stevens stating explicitly that Fitch was "no longer with the District."

4.85    Principal Fitch was replaced by interim principal John Hughes. While the staff believed that the District sent Hughes to remedy the situation at Stevens, this was not true. In fact, Hughes was merely a summer program coordinator for the District with little direct experience and no current building-based leadership experience.

4.86    Hughes' only prior stint as a principal was for a six-months five years before.

4.87    Hughes states that he did not volunteer for the position at Stevens and the District informed him that he would be assigned as the principal because he was the one "picked from a hat."

4.88    Hughes was informed about his reassignment on February 14, 2020 and began February 19, 2020.

4.89    Hughes was given absolutely no briefing or information on the situation happening at Stevens before he arrived and went in with no clue as to how dire the situation was.

4.90    On top of all that, Hughes had not had CPI training in over 10 years.

4.91    When Hughes arrived at Stevens, the SEL class was understaffed and clearly out of control. There was no special education teacher assigned to the classroom and the IAs were now refusing to use any restraints on the children because so many of them had been reported for abuse.

4.92    There was no back up behavioral intervention plan and Hughes was completely ill equipped to provide intervention. As such, he engaged in the unlawful and inappropriate restraint of D.C.G. in March 2020 and then called security to inappropriately restrain D.C.G.

4.93    Subsequent to D.C.G. being abused, an internal District investigation was done of Hughes with several founded concerns. However, Hughes was moved back to his position as summer program coordinator where he remains to this day.

COMPLAINT AND JURY DEMAND 15

## Issues with Tactical Security Team

4.94    The tactical security team for the District that sent Dave Raybern on March 4, 2020, to restrain D.C.G. was a ticking time bomb primed for use of excessive force on small children.

4.95    The team operated as quasi police officers. The internal communications of the team indicate they thought of themselves as police officers. For example, they referred to the District administration building as a "precinct" and the team was encouraged to take trainings specifically designed for police officers, such as fingerprint analysis training[5].  Many of the team members are current military members as well.

4.96    It is unclear what this team does. While Raybern once indicated in email that the purpose of the team was to be the "security blanket" for staff, he seemed to spend large amounts of time on District computers and email buying fishing equipment on Craigslist. Most of the teams' actual duties seemed to be calling the police on unhoused persons that were on school campuses and dropping into schools to restrain children.

4.97    Raybern had been with the District security team for *31 years*.

4.98    He had been sent on previous occasions to restrain other students in the SEL classroom at Stevens.

4.99    Raybern has been the only person terminated in connection with any of the events that happened at Stevens. While Raybern's actions do justify termination in this case, the reason for his firing seems like it was only to protect the jobs of the District Human Resources staff, who were in some ways more culpable than Raybern for D.C.G.'s abuse.

4.100   It was only after KUOW (a local news outlet) reported on D.C.G.'s story (and specifically named Raybern) and attorneys appeared on behalf of D.C.G. in June 2020 that the District started the process of terminating Raybern.

---

[5] It is unclear what the purpose of the fingerprint analysis training was as the tactical security team were not responsible for solving crimes.

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

4.101   He was informed he would be fired before an investigator had interviewed him and an investigation was still in progress.

4.102   Notably, Raybern continued to be on the District's payroll for a month and a half after he was finally terminated by the School Board.

**District Administration was Fully Aware of the Above Issues and Contributed to the Conditions at Stevens**

4.103   When Stevens staff have been asked about what went wrong that led to Stevens becoming such a dangerous environment for children, the staff all point to District administration as to blame for either inaction or contributing to the danger.

4.104   For example, Curtis Nimmons, a District Human Resources administrator, acknowledged to staff that the District was aware that "Stevens was a burning dumpster fire." However, Nimmons also assisted Principal Fitch in his efforts to retaliate against Stevens special education staff members for reporting abuse even going as far as to support Fitch in his efforts to send vaguely threatening emails to Stevens staff members.

4.105   The staff at Stevens all recognized that serious understaffing issue in the SEL classroom was one of the main contributors to the situation. The staff looped in District administrators several times on potential ideas to address the issues.

4.106   The school counselor worked to sign up all the SEL students for mental health counseling through Medicaid. Another staff member even volunteered to write grants for therapeutic animals and yoga in the SEL classroom.

4.107   While staff at Stevens were desperate to try to remedy the situation, the people who could have actually fixed the situation by providing an adequate number of trained staff sat idly by as they were copied on these conversations, saying and doing nothing.

4.108   District Human Resources staff displayed an attitude that the multiple complaints of staff at Stevens was more of a nuisance to them than a serious issue to be addressed. For example, when Principal Fitch refused to communicate with C.C., she brought her concerns to

COMPLAINT AND JURY DEMAND 17

the top and made a complaint directly to Clover Codd, the Chief Human Resources Officer. When Codd assigned the complaint to her staff, they responded to each other saying this one was "another fun one."

4.109   Another problem caused by District administration was that they created significant barriers to reporting instances of restraint and isolation. Reporting of restraint and isolation is required by Washington law.

4.110   The District uses a system called "PowerSchool" to track and report restraint and isolation.

4.111   However, the District did not even give all of the staff – including many members of the special education staff at Stevens – access to PowerSchool or training on how to enter reports.

4.112   When a general education teacher asked Fisher if she was reviewing reports he was entering in PowerSchool, she informed him that she "didn't look at PowerSchool."[6]

4.113   It is also shocking that the District security team was not using PowerSchool and had their own separate reporting system that remained unchecked and was not released to the Office of the Superintendent of Public Instruction (OSPI).

4.114   When OSPI investigated the situation at Stevens they found that there were significant reporting issues in the District and the District was drastically underreporting. This profound oversight at a District level allowed restraint and isolation practices to become excessive and remain unchecked.

4.115   It is also clear that investigation quality and procedures used by District staff are deeply flawed. During the 2019-2020 school year there were at least seven separate District Human Resources staff investigations into abuse of SEL students at Stevens.

4.116   The only investigation that resulted in termination was Raybern's. Not only were the investigations of extremely poor quality, but the District also seemed to be completely

---

[6] Niki Fisher has since been promoted.

COMPLAINT AND JURY DEMAND 18

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

ignoring the red flag of the number of complaints of abuse, which would be of concern to any reasonable person.

4.117   In fact, a competent investigator or supervising Human Resources Manager should have identified that there was a pattern of behavior against students with disabilities that needed to be referred to the District's Equity Compliance Officer – Chief Codd – or the District's Office for Student Civil Rights.

4.118   It is also notable that reports were made to CPS at least twice during the same school year, but there was no serious District follow up or intervention.

## V. CAUSES OF ACTION

### A.  42 U.S.C. § 1983 — Denial of Equal Protection, Race Discrimination, and Failure to Train.

5.1    Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

5.2    Under the Equal Protection Clause of the Fourteenth Amendment, D.C.G. has the right to equal access to an educational environment free from harassment and discrimination on the basis of race.

5.3    At all relevant times, Defendant had unconstitutional customs, policies, or practices of (a) failing to appropriately respond to reports of racial harassment and discrimination from staff members, including reports by Plaintiffs; (b) failing to enforce its policies prohibiting discrimination and harassment when victims are African American students; and (c) failing to adequately train Defendant's administrators and employees on how to recognize, prevent, and cease engaging in racial harassment and discrimination against its students

5.4    Defendant followed these unconstitutional customs, policies and practices with regard to D.C.G. and her parent.

5.5    Defendant's unconstitutional customs, policies, or practices constituted disparate

COMPLAINT AND JURY DEMAND 19

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

treatment of D.C.G. based on her race, in violation of the Equal Protection Clause.

5.6     Defendant's customs, policies, and practices for responding to reports of racial harassment and discrimination by staff were so clearly inadequate that they give rise to a reasonable inference that Defendant consciously acquiesced in the harassment and discrimination.

5.7     Defendant violated D.C.G.'s right to equal protection of the laws on the basis of her race by acting with deliberate indifference to reports of D.C.G.'s harassment and assaults, as well as the racially hostile education environment D.C.G. suffered because of Defendant's failure to take meaningful corrective action. Defendant's deliberate indifference included, without limitation:

a) Ignoring or minimizing a racial animosity in staff members approach of discipline of D.C.G.;

b) Refusing to take meaningful action to address reports of race-based physical assaults against D.C.G., an African American student;

c) Creating a hostile educational climate that tolerates racial harassment and discrimination, including bodily harm of the same to D.C.G.;

d) Failing to appropriately discipline staff who subjected D.C.G. to racial harassment or discrimination;

e) Failing to take meaningful action to correct the conditions causing the racial harassment and discrimination and to prevent its recurrence; and

f) Failing to provide adequate training for its administrators and employees to prevent and address racial harassment and discrimination despite having notice that its procedures were inadequate and resulting in a violation to D.C.G.'s constitutional rights. Defendant's actions and decisions have deprived D.C.G. of the privileges and immunities

COMPLAINT AND JURY DEMAND 20

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

secured by the U.S. Constitution and laws, in violation of 42 U.S.C. § 1983.

5.8     As a direct and proximate result of Defendant's violation of Plaintiffs' equal protection rights under the Fourteenth Amendment, D.C.G. suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including but not limited to: emotional distress; fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

5.9     As a result of Defendant's equal protection violation, Plaintiffs are also entitled to their attorneys' fees and costs.

**B.  Title VI, 42 U.S.C. § 200d — Race Discrimination**

5.10    Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

5.11    42 U.S.C. § 2000d, commonly referred to as Title VI, and its implementing regulations prohibit discrimination in a federally funded school on the basis of a student's race.

5.12    Specifically, 42 U.S.C. § 2000d provides that "No person in the United States shall, on the ground of race, color, or national origin, be exclude from participation in be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

5.13    Defendant is a recipient of federal funds.

5.14    D.C.G. was subjected to harassment, discrimination, and disparate treatment on the basis of her race. Specifically, D.C.G. was subjected to discriminatory discipline and a racially hostile learning environment which included harsh levels of treatment for African American students.

5.15    Defendant had notice of the racial hostility occurring at Stevens Elementary. A

COMPLAINT AND JURY DEMAND 21

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

number of incidents involving special education staff discriminatorily disciplining D.C.G. were reported to the school administration. Defendant failed to take remedial measures to prevent further discrimination of D.C.G. allowing the behavior to continue and permeate throughout the school.

5.16    Racial hostility towards African American students permeated (and continues to permeate) the District of such a severity and pervasiveness as to significantly alter the conditions of D.C.G.'s educational environment resulting in a physical attack and injury and thereby denying D.C.G. equal access to the school resources and opportunities.

5.17    Defendant, despite actual knowledge and adequate opportunity to learn of this misconduct, failed to act promptly to remedy the harassment, discrimination, and disparate treatment to D.C.G.

5.18    As a direct result of the actions and conduct of the Defendant, Plaintiffs suffered and continue to suffer emotional distress, loss of companionship, loss of educational opportunities, and other damages.

5.19    As a result of Defendant's violation, Plaintiffs are entitled to their attorneys' fees and costs.

**C.  Americans with Disabilities Act — Disability-Based Discrimination**

5.20    Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

5.21    With respect to the District's academic and other programs, D.C.G. is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, in that she has a physical or mental impairment that substantially limits their ability to perform one or more major life activities and who, with or without a reasonable modification of the District's general

COMPLAINT AND JURY DEMAND 22

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

education program, meets the essential eligibility requirements for the receipt of educational and other services provided by the School District. 42 U.S.C. §§ 12102 and 12131(2). The Seattle School District is a public entity within the meaning of Title II of the ADA. 42 U.S.C. § 1213(1)(B).

5.22    The District enjoys no absolute, qualified, Eleventh Amendment or other immunity with respect to the Plaintiff's claims under the ADA.

5.23    The District failed D.C.G. by a) knowingly placing her in an inappropriate classroom for her disability-related needs; b) failed to provide her with adequate disability-related supports in the classroom; c) placing her in a classroom with multiple staff members known to assault D.C.G. and another student with disabilities; and d) allowing staff members to excessively restrain and isolate D.C.G. As such, District violated the non-discrimination mandate set forth in the ADA and its implementing regulations. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.1010 et seq. 56.

5.24    Providing D.C.G. the academic and related modifications to which she was entitled would not have constituted an undue burden or hardship for the District.

**D. Section 504 the Rehabilitation Act of 1973 (29 U.S.C. § 794) (Section 504) — Disability-Based Discrimination**

5.25    Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

5.26    With respect to District's academic and other programs, D.C.G. is a qualified individual with a disability within the meaning of Section 504 in that she has a physical or mental impairment that substantially limits his ability to perform one or more major life activities and she meets the essential eligibility requirements for the receipt of educational and other services provided by the District. 29 U.S.C. § 705(20); 34 C.F.R. § 104.3(j).

5.27    Section 504 bars all federally funded entities (governmental or otherwise) from

COMPLAINT AND JURY DEMAND 23

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

discriminating on the basis of disability.

5.28    Defendant receives federal financial assistance and is covered by Section 504.

5.29    The District enjoys no absolute, qualified, Eleventh Amendment or other immunity with respect to the Plaintiff's claims under Section 504.

5.30    By failing to provide D.C.G. the academic and related modifications (or reasonable accommodation) to which she was entitled, the District violated the non-discrimination mandate set forth in Section 504. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1 et seq.; 34 C.F.R. §§ 104.41-104.47.

5.31    Providing D.C.G. the academic and related modifications to which she was entitled would not have constituted an undue burden or hardship for the District.

5.32    The District knowingly, deliberately and wrongfully discriminated against D.C.G. in violation of Section 504 by failing to provide her with an education in the regular educational environment with the use of supplementary aids and services, and by segregating her for several years from peers who reflected their experience, intelligence, and potential.

5.33    During the period 2017 to 2020, the District knowingly, deliberately and repeatedly failed to provide D.C.G. with an educational program and related aids and services that were designed to meet her individual education needs as adequately as the needs of non-disabled students of the District in violation of Section 504; 34 C.F.R. §§ 104.4 and 104.3, each of which authoritatively construe the statute.

5.34    During the period 2017 through 2020, the District knowingly, deliberately and repeatedly failed to determine the educational and related services necessary to appropriately meet D.C.G.'s individual needs, including any good faith exploration of possible accommodations needed to provide them with meaningful access to public education.

COMPLAINT AND JURY DEMAND 24

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

5.35 During the period 2017 through 2020, the District knowingly, deliberately and repeatedly failed to assure that the programs and services provided to D.C.G. resulted in significant learning and conferred a meaningful benefit.

5.36 During the period of 2017 through 2020, the reasonable accommodations necessary to provide D.C.G. with meaningful access to education were available to the District but were never offered or provided.

5.37 During the period of 2017 through 2020, the District wrongfully and deliberately excluded D.C.G. from and denied her access to related services through the District, including, behavioral therapy, social skills training, parental training, and psychological therapy.

5.38 During the period of 2017 through 2020, the District deliberately interfered with parental participation in D.C.G.'s educational programming by withholding information regarding abuse and investigations from C.C.

5.39 Numerous District administrators, officials, and employees had the authority and the responsibility to rectify the District's failures, as set forth above, but wrongfully failed to take appropriate corrective actions.

5.40 At all relevant times, the Defendants, collectively, had knowledge it was substantially likely that their acts and failures to act, as set forth in the preceding paragraphs of this Complaint, would harm D.C.G.'s federally protected rights to be free from discrimination, and to have meaningful access to education and reasonable accommodation with respect to his educational disability. Despite this knowledge, the Defendant failed to act upon that likelihood, thereby causing severe and permanent injury to D.C.G.

5.41 The District's deliberate indifference to D.C.G.'s federally protected rights, as set forth above, resulted in discrimination against D.C.G. and denied her reasonable accommodation

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

for her educational disability and meaningful access to public education in Washington, thereby entitling Plaintiff to recover special and general damages from the District under Section 504 in an amount to be shown at trial.

5.42   The District's deliberate indifference in violating D.C.G.'s rights under Section 504 was a substantial factor in causing D.C.G. to suffer irreversible personal injury and harm, including profound and irreparable injury to his behavior and social functioning.

5.43   Providing D.C.G. the academic and related modifications to which he was entitled would not have constituted an undue burden or hardship for the District.

**E. 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Unlawful Seizure**

5.44   Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

5.45   The Federal Civil Rights Act (42 U.S.C. § 1983) authorizes an individual to bring suit against any "person" who, acting under color of law, deprives the individual of his federal constitutional or statutory rights.

5.46   At all material times, Defendants were acting under color of law.

5.47   By isolating D.C.G. in closets repeatedly throughout the 2018-2019 and 2019-2020 school years, with a staff member blocking the exit, prohibiting her from coming out volitionally, and locking her in a storage room, Defendants violated D.C.G.'s Fourth and Fourteenth Amendment rights to be free from an unreasonable seizure.

5.48   The District's practice of forcing students with disabilities in the closets was part of a longstanding practice or custom which constitutes the standard operating procedure of the District.

5.49   The District allowed staff to continue this custom and practice of isolating students

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

in the closets with the blue mats against their will.

5.50    The Defendant's conduct was the result of deliberate choice.

5.51    The Defendant's conduct was ratified by the District and its Superintendent.

5.52    D.C.G. was injured by the unconstitutional policies, customs and procedures implemented and followed by Defendant in violation of the civil rights of students as provided by the 4th Amendment and Section 1 of the 14th Amendments to the Constitution of the United States and Defendant is liable therefore under 42 U.S.C. §§ 1983 and 1988.

5.53    By engaging in the acts described herein, Defendant, acting under color of law and with deliberate indifference, violated the Plaintiffs' rights under the U.S. Constitution to be free from unreasonable seizures and excessive force.

**F. Washington Law Against Discrimination (WLAD) — Disability and Racial Discrimination**

5.54    Plaintiffs re-allege and incorporate herein the the preceding paragraphs of this Complaint as though set forth in full.

5.55    D.C.G. is an African American student with a disability within the meaning of the Washington State Law Against Discrimination (WLAD), Revised Code of Washington Section 49.60.010 *et.seq.*

5.56    The District operates a place of public accommodation, as defined by Revised Code of Washington Section 49.60.040.

5.57    The District's response to the discriminatory educational environment was neither reasonably prompt nor adequate and constituted an unfair practice under the WLAD.

5.58    Defendant violated D.C.G.'s right to be free from discrimination based on race and disability by acting with deliberate indifference to reports of D.C.G.'s harassment and assaults. Defendant's deliberate indifference included, without limitation:

COMPLAINT AND JURY DEMAND 27

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

a) Refusing to take meaningful action to address reports of numerous physical assaults against D.C.G., an African American student with a disability;

b) Creating a hostile educational climate that tolerates race and disability discrimination, including bodily harm of the same to D.C.G.;

c) Failing to appropriately discipline staff who subjected D.C.G. to race and disability discrimination;

d) Failing to take meaningful action to correct the conditions causing the race and disability discrimination and to prevent its recurrence; and

e) Failing to provide adequate training for its administrators and employees to prevent and address race and disability discrimination.

5.59    The District's failure or refusal to provide equal education opportunities to D.C.G., an African American student with a disability, constitutes an unfair and discriminatory practice under WLAD.

5.60    The District violated WLAD by denying D.C.G. equal educational opportunity and access to its programs and services.

5.61    As a direct and proximate result of these violations of D.C.G.'s clearly established rights, D.C.G. has suffered and will likely continue to suffer injuries and losses as well as general and special damages in an amount to be proven at trial.

5.62    Plaintiff is entitled to reasonable attorney's fees pursuant to WLAD.

**G. Washington Common Law — Negligent Hiring, Training and Supervision**

5.63    Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

COMPLAINT AND JURY DEMAND 28

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

5.64    The District and its Board of Trustees had non-delegable common law duties to exercise reasonable care in the selection, training, supervision and/or retention of the individual persons they employed as administrators and educators to educate, serve and protect students.

5.65    Defendant breached its non-delegable common law duties to exercise reasonable care in the selection, training, supervision and/or retention of special education staff, administrators, investigators, and other persons they employed to educate, serve and protect students. Specifically, the District failed to

a)    Ensure all staff in the SEL classroom were appropriately trained on the District's policies and procedures regarding restraint and isolation;

b)    Ensure all staff in the SEL classroom were trained on how to enter instances of restraint and isolation into the District's reporting system;

c)    Ensure staff in the SEL classroom were complying with the requirement to report instances of restraint and isolation;

d)    Conduct thorough investigations of staff members accused of abusing D.C.G.;

e)    Provide appropriate training to staff members that were have found to have acted inappropriately with D.C.G.;

f)    Provide appropriate training to staff in the SEL classroom regarding disability discrimination;

g)    Provide appropriate training to staff on drafting and implementing special education records;

h)    Ensure special education records for D.C.G. were appropriately maintained and compliant with State and Federal requirements;

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

i)  Ensure that the SEL classroom had sufficient staff members to keep children safe;

j)  Ensure that staff members in the SEL classroom had the necessary experience and qualifications;

k)  Ensure that the SEL classroom had a certificated teacher assigned; and

l)  Ensure that the principal overseeing the SEL staff had appropriate training on managing students with disabilities and restraint and isolation policies.

5.66  Defendant failed to exercise reasonable care to protect third parties from the foreseeable wrongful acts of its employees.

5.67  Defendant failed to control their employees so as to prevent intentional harm or an unreasonable risk of harm to others like D.C.G.

5.68  As a direct and proximate result of Defendant's failures, D.C.G. has suffered and will likely continue to suffer injuries and losses as well as general and special damages in an amount to be proven at trial.

**H. Washington Common Law — Negligence**

5.69  Plaintiffs re-allege and incorporate herein the preceding paragraphs of this Complaint as though set forth in full.

5.70  Defendant stood *in loco parentis* to D.C.G. from the time she entered the Seattle School District forward.

5.71  The District and its Board of Trustees are vicariously liable for the negligent acts and/or omissions by its employees against D.C.G.

5.72  Defendants breached its duty to exercise reasonable care to educate, socialize, assist, protect and serve D.C.G.

COMPLAINT AND JURY DEMAND 30

5.73    Additionally, Defendant has a duty to exercise reasonable care to avoid from harming all foreseeable plaintiffs. Defendant has a duty to exercise reasonable care in the hiring, training, and supervision of their employees and agents. Defendant has a duty to use reasonable care in administering discipline to students, with whom they have a special relationship.

5.74    Defendant's acts of hiring, retraining, failing to supervise, or failing to train staff at Stevens Elementary and security guards was unreasonable and breached the standard of care.

5.75    As a direct and proximate result of Defendant's breach of duties and resulting negligence, D.C.G. suffered and will likely continue to suffer injuries and losses as well as general and special damages in an amount to be proven at trial.

**I. Washington Common Law — False Imprisonment**

5.76    Plaintiffs re-allege and incorporate herein the the preceding paragraphs of this Complaint as though set forth in full.

5.77    The District intended to confine D.C.G. within a limited area through physical force when staff restrained her and isolating her when D.C.G. was not posing an immediate threat of harm to herself or others when they kept her confined in a closet and restrained her multiple times over the 2017-2018, 2018-2019 and 2019-2020 school years.

5.78    All individual staff members were acting within the course and scope of their employment with the District at the time of the above-described acts and omissions, and in furtherance of the District's business.

5.79    To the extent that the Defendant argues that their actions were justified, Plaintiffs assert that Defendant's actions were unreasonable and outside the scope of Wash. Rev. Code § 28A.600.485.

5.80    The District's affirmative conduct caused a confinement of D.C.G.

COMPLAINT AND JURY DEMAND 31

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

5.81     D.C.G. was aware that she was confined and suffered bodily harm as a result of his confinement

5.82     D.C.G. did not consent to the confinement

5.83     As a direct and proximate result of these violations, Plaintiffs suffered damages.

**J. Washington Common Law — Assault and Battery**

5.84     Plaintiffs re-allege and incorporate herein the the preceding paragraphs of this Complaint as though set forth in full.

5.85     On January 14, 2020 and March 4, 2020, Defendant, through its employees, intended to cause fear and apprehension of an imminent harmful or offensive contact and committed acts that resulted in D.C.G.'s fear or apprehension of such contact.

5.86     Defendant through its employees intended to touch D.C.G. in a harmful or offensive manner and committed acts that resulted in harmful or offensive contact with D.C.G.

5.87     To the extent Defendant argues the force used on D.C.G. was reasonable and necessary—that no reasonably effective alternative existed—Plaintiffs assert that Defendant's force was excessive, unnecessarily violent, and unreasonable.

5.88     D.C.G. did not consent to the contact.

5.89     As a direct and proximate result of these violations, D.C.G. suffered damages.

5.90     The individual staff employed by the District were acting within the course and scope of their employment with the District at the time of the above-described acts and omissions, and in furtherance of the District's business. Defendant is vicariously liable for the negligence of the individual staff members under *respondeat superior*.

5.91     The contact with D.C.G. on these occasions would offend a reasonable sense of personal dignity.

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

**K. Washington Common Law — Outrage**

5.92    Plaintiffs re-allege and incorporate herein the the preceding paragraphs of this Complaint as though set forth in full.

5.93    D.C.G. was a vulnerable elementary aged child at the time she was assaulted by her special education staff and repeatedly and excessively restrained and isolated.

5.94    Defendant's acts and omissions were so outrageous as to shock the conscience of a reasonable person in society. Defendant's actions were so unreasonable, cruel, and unusual as to amount to actionable outrage. These acts proximately caused D.C.G. to suffer significant physical harm, mental, emotional, and cognitive distress, as well as special damages.

**L. Washington Common Law — Negligent Infliction of Emotional Distress**

5.95    Plaintiffs re-allege and incorporate herein the the preceding paragraphs of this Complaint as though set forth in full.

5.96    Defendant negligently inflicted emotional distress on D.C.G. by creating a severely distressing educational environment beyond what a reasonable person would be expected to endure.

5.97    On information and belief, the Plaintiffs' mental anguish and emotional distress would not have occurred, had the Defendant and its employees exercised the proper standard of care.

**M. Wash. Rev. Code § 4.24.010 — Loss of Consortium**

5.98    Plaintiffs re-allege and incorporate herein the the preceding paragraphs of this Complaint as through set forth in full.

5.99    Plaintiff C.C. is the natural parent of D.C.G. and has supported her since birth.

COMPLAINT AND JURY DEMAND 33

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

5.100 As a direct and proximate result of the Defendant's tortious conduct, C.C. has suffered a loss of consortium with her daughter, resulting in general and special damages in an amount to be proven at trial.

## V.     PRAYER FOR RELIEF

6.1     Plaintiffs request the following relief as follows:

6.2     For general and special damages to Plaintiffs for harm suffered, permanent injuries, opportunities denied, and deprivation of rights in an amount to be proven at trial;

6.3     Plaintiffs seeks general damages for extreme mental suffering and emotional distress, as well as special damages, in an amount to be proven at trial, all of which were directly and proximately caused by Defendant's acts and omissions.

6.4     An award of Plaintiff's expenses, costs, and reasonable attorneys' fees under 42 U.S. C. §1988 and any other applicable provision of federal or state law;

6.5     An award of punitive damages under applicable provisions of federal law.

6.6     Plaintiffs pray for such other equitable or legal relief as the Court deems just.

## VII. RESERVATION OF RIGHTS

7.1     Plaintiffs reserve the right to assert additional claims as may be appropriate following further investigation and discovery.

COMPLAINT AND JURY DEMAND 34

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101

## VIII. JURY DEMAND

8.1      Under the Federal Rules of Civil Procedure, Plaintiffs demand that this action be tried before a jury.

Dated this 9th day of May, 2021.

s/Shannon McMinimee
Shannon M. McMinimee, WSBA No. 34471
Cedar Law PLLC
13 Cherry Street PMB 96563
Seattle, WA 98104-2205
Tel 206.607.8277
Fax 206.237.9101
Shannon@cedarlawpllc.com

s/Lara Hruska
Lara Hruska, WSBA No. 46531
Cedar Law PLLC
13 Cherry Street PMB 96563
Seattle, WA 98104-2205
Tel 206.607.8277
Fax 206.237.9101
Lara@cedarlawpllc.com

s/Whitney Hill
Whitney Hill, WSBA No. 53715
Cedar Law PLLC
13 Cherry Street PMB 96563
Seattle, WA 98104-2205
Tel 206.607.8277
Fax 206.237.9101
Whitney@cedarlawpllc.com

**Cedar Law PLLC**
113 Cherry St. PMB 96563
Seattle, WA, 98104
Tel 206.607.8277
Fax 206.237.9101